## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

STEPHENIE STONE, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,          CLASS ACTION

   vs.

                          **JURY TRIAL DEMANDED**

LAKEVIEW LOAN SERVICING, LLC,

                Defendant.

---

## CLASS ACTION COMPLAINT

Plaintiff Stephenie Stone ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, upon personal knowledge as to her and her own acts and experiences, and upon information and belief as to all other matters, alleges as follows:

### NATURE OF THE ACTION

1.    Plaintiff Stephenie Stone brings this Class Action Complaint against Defendant Lakeview Loan Servicing, LLC ("Lakeview" or "Defendant") to seek recovery on behalf of herself and over 2.5 million similarly situated people ("Class Members"), based upon Defendant's failure to properly secure and safeguard its customers' sensitive personally identifiable information ("PII").

2.    Specifically, Defendant failed to properly protect Plaintiff's and Class Members' names, addresses, loan numbers and Social Security numbers, and other information provided in connection with a loan application, loan modification, or other items regarding loan servicing. This information is considered PII because it can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 CFR

1

§200.79.

3.      Defendant discovered that an unauthorized actor gained access to its file servers in December 2021.   Defendant later determined that an unauthorized party gained access to Defendant's server from October 27, 2021 to December 7, 2021, and that the data on this server included Plaintiff's and Class Members' PII (the "Data Breach").

4.      Despite learning of the Data Breach in December, Defendant did not notify Plaintiff and Class Members until mid-March 2022 ("Notice of Data Breach Letter").   As required by state laws across the country, Defendant sent templates of the Notice of Data Breach Letter to state attorneys general.   Specifically, Defendant sent a template of the Notice of Data Breach Letter to the Maine Attorney General and identified that approximately 2,537,261 individuals like Plaintiff had their PII accessed, exfiltrated, and/or compromised on the Data Breach.[1]   Defendant also reported the Data Breach to the California Attorney General's Office,[2] as well as the Texas Attorney General's Office.   The Texas Attorney General's Office notes the Data Breach was published to its website on March 21, 2022 and affected 255,762 Texans.[3]

5.      The Data Breach occurred because Defendant did not implement adequate and reasonable cyber-security procedures and protocols to protect the PII of Plaintiff and Class Members.   Because Defendant's data security protocols and practices were deficient, unauthorized

---

[1]    https://apps.web.maine.gov/online/aeviewer/ME/40/3d0c184e-e78c-4123-8ce8-8535f71facd3.shtml (last visited Mar. 29, 2022).

[2]    https://oag.ca.gov/ecrime/databreach/reports/sb24-551822 (last visited Mar. 30, 2022). The information exposed in the Data Breach was unencrypted. California law requires companies to notify California residents "whose ***unencrypted*** personal information was, or is reasonably believed to have been, acquired by an unauthorized person" due to a "breach of the security system[.] Cal. Civ. Code §1798.82(a)(1) (emphasis added). Defendant notified the California Attorney General of the Data Breach on March 18, 2022.

[3]    https://oagtx.force.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Apr. 8, 2022).

4854-2453-8907

person(s) were able to access, view, and/or exfiltrate Plaintiff's and Class Members' PII. Notably, in its letter to the New Hampshire Attorney General, Defendant acknowledged that "[Defendant] has taken additional steps to further enhance its existing security measures."[4] The fact that Defendant enhanced its security features post-Data Breach indicates Defendant's cybersecurity measures were inadequate, negligent, and lacking at the time of the Data Breach.

6.      Defendant failed to properly safeguard Plaintiff's and Class Members' PII. Defendant's negligence has caused millions of Class Members harm and puts them at a substantially increased risk of identity fraud, which will negatively impact them for years.

7.      Defendant is wholly responsible for this Data Breach through its failure to implement and maintain adequate and reasonable data security safeguards, and failure to comply with industry-standard data security practices and federal and state laws and regulations governing data security and privacy, including security of PII.

8.      Defendant failed to timely recognize and detect unauthorized access and use of its systems, and failed to timely recognize the substantial amounts of data that had been compromised.

9.      Defendant failed to, among other things: (1) timely detect any unauthorized actors had accessed its file servers; (2) notice the massive amounts of data that were compromised and accessed; and (3) take any steps to investigate the red flags that should have warned Defendant that its systems were not secure.

10.      Moreover, if Defendant properly maintained and monitored its information technology infrastructure and denied access to that infrastructure to all potential threats, Defendant would have either prevented the Data Breach altogether or at the very least discovered the invasion

---

[4]      https://www.doj.nh.gov/consumer/security-breaches/documents/lakeview-loan-servicing-20220318.pdf (last visited Mar. 29, 2022).

sooner.

11.     Defendant had numerous statutory, regulatory, and common law duties to Plaintiff and Class Members to keep their PII, confidential, safe, secure, and protected from unauthorized disclosure or access.

12.     Defendant was and remains required to maintain the security and privacy of the PII entrusted to them.  When Plaintiff and Class Members provided their PII, Defendant and its agents were required to comply with the obligation to keep Plaintiff's PII secure and safe from unauthorized access, to use this information for business purposes only, and to make only authorized disclosures of this information. [5]

13.     Defendant was cognizant of the ever-growing and ever-present threat of cybersecurity attacks.  Despite this awareness, Defendant failed to properly safeguard Plaintiff's and Class Members' information.  This makes Defendant's failure particularly egregious.

14.     By virtue of Defendant's business practices, Defendant represented to Plaintiff and Class Members that it would protect their PII.

15.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII by entrusting their PII to a company that represented it would protect and safeguard their PII.

16.     Plaintiff's and Class Members' PII was accessed and downloaded by one or more unauthorized actors because Defendant failed to properly protect the PII of Plaintiff and Class Members.

17.     Because of Defendant's failure to properly protect the PII in its possession, Plaintiff and Class Members are now at a significant present and future risk of identity theft, financial fraud,

---

[5]     https://lakeview.com/privacy-policy/ (last visited Mar. 31, 2022).

and/or other identity-theft or fraud, imminently and for years to come.

18.     Defendant's conscious decision to delay notifying Plaintiff and Class Members for over four months exacerbated the harm that Plaintiff and Class Members have and will experience. Moreover, Plaintiff and Class Members were unable to take actions to protect themselves and attempt to mitigate the harm until they received notice.

19.     Plaintiff and Class Members have suffered numerous actual and imminent injuries as a direct result of the Data Breach, including:

a.   Theft of their PII;

b.   Costs associated with the detection and prevention of identity theft;

c.   Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach;

d.   The emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach;

e.   The actual and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of the ill-intentioned hackers and/or criminals and made available on the Dark Web;

f.   Damages to and diminution in value of their personal data;

g.   Actual damages in the form of the difference in value between the services that should have been delivered and the services that were actually delivered; and

h.   The continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

20.     Plaintiff seeks to remedy these harms and future harms on behalf of herself and all similarly situated persons.

21.     Accordingly, Plaintiff, on behalf of herself and Class Members, asserts claims for negligence.  Plaintiff and Class Members seek injunctive relief, monetary damages, and all other relief as authorized in equity or by law.

## THE PARTIES

### *Plaintiff*

22.     Plaintiff Stephenie Stone is a citizen of Texas.

23.     Plaintiff received a letter from Defendant on April 4, 2022, dated March 21, 2022, notifying her of the Data Breach and that her PII was included in Data Breach.  Specifically, The Notice of Data Breach Letter stated that Plaintiff's PII was accessed in the Data Breach, stating "On January 31, 2022, the review process generated a preliminary list of individuals, including you, whose name, address, loan number and Social Security number were included in the files" that were accessed by the unauthorized actor during the Data Breach.  The letter also stated, "For some, the accessed files may also have included information provided in connection with a loan application, loan modification, or other items regarding loan servicing."

### *Defendant Lakeview Loan Servicing, LLC*

24.     Defendant is a Delaware limited liability company with its principal place of business in Coral Gables, Florida.  According to Defendant's filings with the Florida Department of State, all members of Defendant as a limited liability company are residents and citizens of Florida and have an apparent intention to remain domiciled in Florida.

25.     Defendant touts itself as the fourth largest mortgage servicer in the United States and claims to work with more than 1.4 million customers annually with their mortgages.  To conduct its business, Defendant requires certain type of PII, such as name, Social Security number,

6

income, account balances, payment history, and credit history and scores [6].

## JURISDICTION & VENUE

26.     This Court has original jurisdiction under the Class Action Fairness Act ("CAFA"),

28 U.S.C. §1332(d)(2), because this is a putative class action involving more than 100 Class

Members and because the amount in controversy exceeds $5,000,000, exclusive of interest and

costs.  Moreover, Plaintiff, many absent Class Members,[7] and Defendant are citizens of different

states.  Plaintiff is a citizen of Texas and the members of Defendant as a limited liability company

are citizens of Florida thereby satisfying CAFA's minimal diversity requirement.

27.     This Court has general personal jurisdiction over Defendant because its principal

place of business is located in this district at 4425 Ponce de Leon Boulevard, Coral Gables, FL

33146.

28.     Venue is proper in this district under 28 U.S.C. §§1391(a)(1), 1391(b)(1),

1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated

from activities within this district, Defendant conducts substantial business in this district, and is

located in this district.   On information and belief, Plaintiff's and Class Members' PII was

transmitted to and by Defendant, inputted into Defendant's network within this district.  Defendant

is based in this district, is believed to maintain Plaintiff's and Class Members' PII in the district,

and the harm caused to Plaintiff and Class Members emanated from this district.

---

[6]     *See* Defendant's Privacy Policy, *https://lakeview.com/privacy-policy/* (last visited Apr. 1, 2022).

[7]     While Defendant service mortgages for Floridians, Plaintiff and other Class Members outside Florida were impacted, including 9,511 residents of Maine. https://apps.web.maine.gov /online/aeviewer/ME/40/3d0c184e-e78c-4123-8ce8-8535f71facd3.shtml (last visited Mar. 31, 2022)

## FACTUAL ALLEGATIONS

***Defendant Acquires, Collects, and Maintains Plaintiff's and Class Members' PII***

29.     Plaintiff and Class Members have a contractual relationship with Defendant. Defendant provides mortgage servicing on their loans.  During this process, Defendant required Plaintiff and Class Members to provide their sensitive PII to Defendant.

28.     Defendant, in its Privacy Policy, promises to protect Plaintiff's and Class Members' PII.[8]  Despite the representations in the Privacy Policy, Defendant failed to protect Plaintiff's and Class Members' PII because an unauthorized actor accessed Plaintiff's and Class Members' PII during the Data Breach without their consent.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and the Class Members' PII, Defendant assumed legal and equitable duties to those individuals and knew or should have known that they were responsible for protecting Plaintiff's and Class Members' PII from disclosure.  Said differently, by collecting this information, Defendant has an obligation to protect PII.

30.     Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII.  Defendant was required to keep Plaintiff's and Class Members' PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

***The Data Breach***

31.     An unauthorized person obtained access to files on Defendant's file storage servers from October 27, 2021 to December 7, 2021.

---

[8]     Defendant's Privacy Policy, https://lakeview.com/privacy-policy/ (last visited Mar. 30, 2022) ("To protect your personal information from unauthorized access and use, we use security measures that comply with federal law.  These measures include computer safeguards and secured files and buildings.).

4854-2453-8907

32.     In response, Defendant retained an investigation team to identify the content accessed.  On January 31, 2022, Defendant disclosed that these files contained, at the very least, Plaintiff's and Class Members' names, addresses, loan numbers, and Social Security numbers.

33.     Upon information and belief, the data accessed in the Data Breach was then exfiltrated and sold or publicly posted on the internet.

34.     The Notice of Data Breach Letter sent to Plaintiff and Class Members offered them a one-year membership to credit monitoring services.  This is wholly inadequate because data breach victims and other unauthorized disclosures commonly face multiple years of ongoing identity theft. Indeed, Defendant informed Class Members to "be vigilant for incidents of fraud or identity theft . . . over the next 12 to 24 months."[9]

35.     The Notice of Data Breach Letters sent to Class Members also suggested several additional time-consuming steps that Plaintiff and Class Members could take to protect themselves as a result of Data Breach, such as fraud alerts, credit freezes, and/or contacting government authorities.

36.     Based on Defendant's urging Plaintiff and Class Members to take these mitigating actions, as well as its decision to provide victims with credit monitoring services, it is abundantly clear that the perils from the Data Breach are real and concrete.

37.     Despite all of the publicly available knowledge of the continued compromises of PII, Defendant's approach to maintaining the privacy of Plaintiff's and Class Members' PII was inadequate, unreasonable, negligent, and reckless.  This is evidenced by Defendant's Notice of Data Breach Letter.  In it, Defendant states, "[a]dditional steps are being taken to further enhance

---

[9]     *See, e.g.*, template of the Notice of Data Breach Letter submitted to California Office of Attorney                    General,                    https://oag.ca.gov/system/files/Lakeview%20-%20California%20Notification.pdf (last visited Mar. 30, 2022).

our existing security measures."[10]   Defendant's statement admits that at the time of the Data Breach, Defendant's technical and cybersecurity capabilities were inadequate, which in turn, caused the Data Breach and the divulgence of Plaintiff's and Class Members' PII.

38.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- An awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scanning of all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Firewalls configured to block access to known malicious IP addresses.

- Patching of operating systems, software, and firmware on devices, including considering use of a centralized patch management system.

- Anti-virus and anti-malware programs set to conduct regular scans automatically.

- Management over the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Access control configurations—including file, directory, and network share permissions—with the principle of the least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email, including considering using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Software Restriction Policies (SRP) or other controls to prevent programs from

---

[10]   https://oag.ca.gov/system/files/Lakeview%20-%20California%20Notification.pdf (last visited Mar. 30, 2022).

executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Disabling Remote Desktop protocol (RDP) if it is not being used.

- Application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Executing operating system environments or specific programs in a virtualized environment.

- Categorization of data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

39.     To prevent and detect cyber-attacks Defendant could and should have followed the recommendations of the United States Cybersecurity & Infrastructure Security Agency, which called for the following measures:

- **Update and patch your computer**.  Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

- **Use caution with links and when entering website addresses**.  Be careful when clicking directly on links in emails, even if the sender appears to be someone you know.    Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization's website or the topic mentioned in the email).  Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

- **Open email attachments with caution**.  Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

- **Keep your personal information safe**.  Check a website's security to ensure the information you submit is encrypted before you provide it….

- **Verify email senders**.  If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly.  Do not click on any links in the email.  If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

- **Inform yourself**.  Keep yourself informed about recent cybersecurity threats and up

11

4854-2453-8907

to date on ransomware techniques.  You can find information about known phishing attacks on the Anti-Phishing Working Group website.  You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

- **Use and maintain preventative software programs**.  Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[11]

40.     To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

---

[11]   *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), https://us-cert.cisa.gov/ncas/tips/ST19-001 (last visited Nov. 11, 2021).

4854-2453-8907

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[12]

41.     Given that Defendant was storing the PII of Plaintiff and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

42.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks.  The failure to implement some or all of the above measure resulted in the data breach and the exposure of over 2.5 million Class Members' PII. Moreover, based on Defendant's notification to the California Attorney General, Defendant failed to encrypt the PII on its network and systems, which was negligent in and of itself.

***Defendant Knew or Should Have Known of the Risk Because the Financial Sector Is Particularly Susceptible to Cyber Attacks***

43.     Defendant knew and understood unprotected or exposed PII in the custody of loan service companies, such as Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

44.     Defendant is wholly cognizant of how sensitive the PII it stores and maintains is. It is a well-established fact that PII may be used for a variety of illicit purposes and at great harm to data breach victims.  Defendant is also aware of how much PII it collects, uses, and maintains

---

[12] *See* Human-operated ransomware attacks: A preventable disaster (Mar. 5, 2020), https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Nov. 11, 2021).

from Plaintiff and Class Members.  Upon information and belief, Defendant is or should be especially cognizant given Defendant stores PII even after the PII is no longer necessary for business use.

45.     Businesses that store personal information are likely to be targeted by cyber criminals. Credit card and bank account numbers are tempting targets for hackers, but credit and debit cards can be cancelled, quickly mitigating the hackers' ability to cause further harm.  Instead, types of PII that cannot be easily changed (such as dates of birth and Social Security numbers) are the most valuable to hackers.[13]

46.     At a Federal Trade Commission ("FTC") public workshop in 2001 (more than 20 years ago), then-Commissioner Orson Swindle described the value of a consumer's personal information as follows:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.  Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[14]

47.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[15]

48.     The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government

---

[13]  *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon McCarthy Enters. (July 21, 2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/.
[14]  Transcript, *The Information Marketplace: Merging and Exchanging Consumer Data*, FTC (Mar. 13, 2001), https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf.
[15]  17 C.F.R. §248.201 (2013).

issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[16]   In other words, the FTC's definition of "identifying information" includes the precise information lost in this Data Breach by Defendant.

49.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web.  Numerous sources cite dark web pricing for stolen identity credentials.  For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[17]  Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[18]  Criminals can also purchase access to entire company data breaches from $900 to $4,500.[19]

***Social Security Numbers Are Particularly Valuable***

50.     Defendant's Notice of Data Breach Letter admits that Plaintiff's and Class Members' Social Security numbers were included in the Data Breach. [20]

51.     Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change.  The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you.  Identity thieves can use your number and your

---

[16]   *Id.*

[17]   *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Jan. 19, 2022).

[18]   *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/  (last visited Jan. 19, 2022).

[19]   *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Jan. 19, 2022).

[20]   *See supra* note 9.

15

good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.  Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[21]

52.     It is incredibly difficult to change a stolen Social Security number.  An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse.  Preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

53.     Even obtaining a new Social Security number may not be effective.  According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[22]

54.     Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts.  The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security number, driver's license number, name, and date of birth.

55.     This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information,

---

[21]   Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 19, 2022).

[22]   Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

personally identifiable information and Social Security numbers are worth more than 10x on the black market."[23]

56.     Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

57.     There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used.  According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

58.     At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, including Social Security numbers and dates of birth, and of the foreseeable consequences that would occur if Defendant's data security system and network was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

59.     Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.  The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

60.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s) and thus the significant number of individuals

---

[23]   Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[24]   *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

who would be harmed by the exposure of unencrypted data.

61.     According to the FTC, identity theft wreaks havoc on consumers' finances, credit history, and reputation and can take time, money, and patience to resolve.[25]  Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank and finance fraud.[26]

62.     The physical, emotional, and social toll suffered (in addition to the financial toll) by identity theft victims cannot be understated.[27]  "A 2016 Identity Theft Resource Center survey of identity theft victims sheds light on the prevalence of this emotional suffering caused by identity theft: 74 percent of respondents reported feeling stressed[,] 69 percent reported feelings of fear related to personal financial safety[,] 60 percent reported anxiety[,] 42 percent reported fearing for the financial security of family members[, and] 8 percent reported feeling suicidal."[28]

63.     More recently, the FTC released an updated publication on protecting PII for businesses, which includes instructions on protecting PII, properly disposing of PII, understanding network vulnerabilities, implementing policies to correct security problems, using intrusion detection programs, monitoring data traffic, and having in place a response plan.

64.     The FTC has brought enforcement actions against businesses for failing to protect

---

[25] *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, 3 (Apr. 2013), https://www.justice.gov/usao-wdmi/file/764151/download.

[26] *See id.*  The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."  16 C.F.R. §603.2(a).  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 16 C.F.R. §603.2(b)

[27] Alison Grace Johansen, *4 Lasting Effects of Identity Theft*, NortonLifeLock (Mar. 13, 2018), https://www.lifelock.com/learn-identity-theft-resources-lasting-effects-of-identity-theft.html.

[28] *Id.* (citing *Identity Theft: The Aftermath 2016™*, Identity Theft Resource Center (2016) https://www.idtheftcenter.org/images/page-docs/AftermathFinal_2016.pdf).

consumers' PII.  The FTC has done this by treating a failure to employ reasonable measures to protect against unauthorized access to PII as a violation of the FTC Act, 15 U.S.C. §45.

65.     The United States government and privacy experts acknowledge that it may take much time for identity theft to come to light and be detected because identity thieves may wait years before using the stolen data.

66.     Because the information Defendant allowed to be compromised and taken is of such a durable and permanent quality (*i.e.*, name, address, lean number, and Social Security number), the harms to Plaintiff and the Class will continue and increase, and Plaintiff and the Class will continue to be at substantial risk for further imminent and future harm.

***Defendant's Post-Breach Activity Was (and Remains) Inadequate.***

67.     Immediate notice of a security breach is essential to protect victims such as Plaintiff and Class Members.

68.     Defendant did not notify Plaintiff and Class Members until late March 2022, or more than four months from the discovery of the Data Breach.

69.     By failing to timely inform Plaintiff and Class Members, Defendant exacerbated the harm that Plaintiff and Class Members suffered as a result of the Data Breach.

70.     Plaintiff and Class Members have suffered real and tangible losses, including but not limited to, the loss in the inherent value of their PII, the loss of their time as they have had to spend additional time monitoring accounts and activity, and additional economic loss to mitigate the costs of injuries realized as a result of discovery in this case.

71.     Despite Defendant's failure to protect Plaintiff's and Class Members' PII and the resulting harm Defendant has only offered to provide Plaintiff and Class Members with one year of credit monitoring.

72.     As a result of the Defendant's failure to prevent the Data Breach, Plaintiff and Class

Members have suffered, will suffer, or are at increased risk of suffering:

     a.   The compromise, publication, theft and/or unauthorized use of their PII;

     b.   Unauthorized use and misuse of their PII;

     c.   The loss of the opportunity to control how their PII are used;

     d.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

     e.   Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

     f.   The imminent and certain impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

     g.   The continued risk to their PII that is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII in Defendant's possession; and

     h.   Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

73.    In addition to a remedy for the economic harm, Plaintiff and the Class maintain an undeniable and continuing interest in ensuring that their PII that remains in the possession of Defendant is secure, remains secure, and is not subject to further theft.

***Plaintiff Stephenie Stone's Experience***

74.    Plaintiff was required to provide and did provide her PII in connection with obtaining the mortgage serviced by Defendant.  The PII included, but was not limited to, her name, address, Social Security number, and tax information.

75.    The Notice of Data Breach Letter admits Plaintiff's PII was accessed in the Data Breach.  The Letter also states that Defendant knew about this by January 31, 2022, but did not inform Plaintiff and Class Members until mid-to-late March 2022.

76.     Plaintiff typically takes measures to protect her PII and is very careful about sharing her PII.  She has never knowingly transmitted unencrypted PII over the internet or other unsecured source.

77.     Plaintiff stores any documents containing her PII in a safe and secure location. She diligently chooses unique usernames and passwords for her online accounts.  Further, Plaintiff's field of expertise is information technology and is well aware of the measures that need to be taken in order to avoid disclosure of her PII.

78.     As a result of the Data Breach, Plaintiff has suffered a loss of time and has spent and continues to spend a considerable amount of time on issues related to this Data Breach.  In November 2021, bad actors began accessing multiple accounts owned by Plaintiff, and they continue to do so.  The bad actors attempted to open fraudulent accounts using Plaintiff's PII. Plaintiff was required to file multiple police reports as a result of the bad actors' fraudulent actions.

79.     As a result of the Data Breach, Plaintiff must monitor her accounts and credit scores and has sustained emotional distress.  It was also necessary for Plaintiff to place credit holds with the three credit reporting agencies.  Plaintiff will need to spend additional time and effort opening new accounts.  Plaintiff intends to spend time taking steps to protect her PII with the major credit bureaus as well.  Because of the Data Breach, Plaintiff will have time taken from other obligations.

80.     Plaintiff also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant for the purpose of obtaining services from Defendant, which was compromised in and as a result of the Data Breach.

81.     Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

82.     Plaintiff has suffered imminent and impending injury arising from the substantially

increased risk of fraud, identity theft, and misuse resulting from her PII, especially her Social Security number, being placed in the hands of criminals.

83.     As a result of the Data Breach, Plaintiff is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

84.     To date, Defendant failed to either adequately protect Plaintiff and Class Members or to compensate them for their injuries sustained in this Data Breach.  The offer of identity monitoring services for twelve months is wholly insufficient to cover the current and future harm. Indeed, Defendant's Notice of Data Breach Letter advises Plaintiff and Class Members to remain vigilant for the next "12 to 24 months."

### *Defendant Violated the FTC Act*

85.     Section 5 of the FTC Act, 15 U.S.C. §45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII.  The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

86.     Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

### CLASS ACTION ALLEGATIONS

87.     Pursuant to the provisions of Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4), Plaintiff seeks to bring this class action on behalf of herself and a nationwide class (the "Nationwide Class") defined as follows:

**All persons who reside in the United States who received or were otherwise sent notice that their data was potentially compromised due to the Data Breach.**

88.     Plaintiff also seeks to certify the following subclass:

**Texas Subclass: All persons who reside in the State of Texas and received or were otherwise sent notice that their data was potentially compromised due to the data breach.**

89.     Excluded from the Class are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by Defendant; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendant.  Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

90.     Plaintiff reserves the right to modify and/or amend the Nationwide Class and the Texas Subclass definitions, including, but not limited to, creating additional subclasses, as necessary.

91.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of the claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

92.     All Class Members are readily ascertainable in that Defendant has access to addresses and other contact information for all Class Members, which can be used for providing notice to Class Members.

93.     *Numerosity*.  Consistent with Fed. R. Civ. P. 23(a)(1), the Nationwide Class and the Texas Subclass are so numerous that joinder of all members is impracticable.  While the exact number of Nationwide Class Members is unknown, upon information and belief, it is in excess of 2.5 million, and the Texas Subclass more than likely contains at least 100 individuals.

94.     ***Commonality and Predominance***.  Consistent with Fed. R. Civ. P. 23(a)(2) and (b)(3), this action involves common questions of law and fact that predominate over any questions that may affect only individual Class Members.  Such common questions include:

a.   whether Defendant engaged in the wrongful conduct alleged in this Complaint;

b.   whether Defendant's conduct was unfair, unconscionable, and/or unlawful;

c.   whether Defendant failed to implement and maintain adequate and reasonable systems and security procedures and practices to protect Plaintiff's and Class Members' PII;

d.   whether Defendant owed a duty to Plaintiff and Class Members to adequately protect their PII and to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

e.   whether Defendant breached its duties to protect the PII of Plaintiff and Class Members by failing to provide adequate data security and failing to provide appropriate and adequate notice of the Data Breach to Plaintiff and Class Members;

f.   whether Defendant's conduct was negligent;

g.   whether Defendant knew or should have known that its computer systems were vulnerable to being compromised;

h.   whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the Data Breach of its systems, resulting in the loss of Plaintiff's and Class Members' PII;

i.   whether Defendant wrongfully or unlawfully failed to inform Plaintiff and Class Members that it did not maintain data security practices adequate to reasonably safeguard Plaintiff's and Class Members' PII;

j.   whether Plaintiff and Class Members suffered injury, including ascertainable losses, as a result of Defendant's conduct (or failure to act);

k.   whether Plaintiff and Class Members are entitled to recover damages; and

l.   whether Plaintiff and Class Members are entitled to declaratory relief and equitable relief, including injunctive relief, restitution, disgorgement, and/or other equitable relief.

95.     ***Typicality***.  Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiff's claims are typical

of the claims of other Class Members in that Plaintiff, like all Class Members, had their personal data compromised, breached, and stolen in the Data Breach.  Plaintiff and all Class Members were injured through the misconduct of Defendant and assert the same claims for relief.

96.     *Adequacy*.  Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiff and counsel will fairly and adequately protect the interests of the Class.  Plaintiff is a member of the Class she seeks to represent; is committed to pursuing this matter against Defendant to obtain relief for the Class; and has no interests that are antagonistic to, or in conflict with, the interests of other Class Members. Plaintiff retained counsel who are competent and experienced in litigating class actions and complex litigation, including privacy litigation of this kind.  Plaintiff and her counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

97.     *Superiority*.  Consistent with Fed. R. Civ. P. 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation.  Moreover, absent a class action, most Class Members would find the cost of litigating their claims prohibitively high and would therefore have no effective remedy, so that in the absence of class treatment, Defendant's violations of law inflicting substantial damages in the aggregate would go unremedied without certification of the Class.  Plaintiff and Class Members have been harmed by Defendant's wrongful conduct and/or action.  Litigating this action as a class action will reduce the possibility of repetitious litigation relating to Defendant's conduct and/or inaction. Plaintiff knows of no difficulties that would be encountered in this litigation that would preclude its maintenance as a class action.

98.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because the common questions of law or fact predominate over any questions affecting individual Class

4854-2453-8907

Members, a class action is superior to other available methods for the fair and efficient adjudication of this controversy, and the requirements of Rule 23(a) are met.

99.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant.  In contrast, the conduct of this action as a class action conserves judicial resources and the parties' resources and protects the rights of each Class Member.  Specifically, injunctive relief could be entered in multiple cases, but the ordered relief may vary, causing Defendant to have to choose between differing means of upgrading its data security infrastructure and choosing the court order with which to comply.  Class action status is also warranted because prosecution of separate actions by Class Members would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

100.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant, through its uniform conduct, acted or failed and refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.  Moreover, Defendant continues to maintain its inadequate security practices, retain possession of Plaintiff's and Class Members' PII, and has not been forced to change its practices or to relinquish PII by nature of other civil suits or government enforcement actions, thus making injunctive relief a live issue and appropriate to the Class as a whole.

101.    Particular issues are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the claims present particular, common issues, the resolution of which would materially

advance the resolution of this matter and the parties' interests therein.  Such particular issues include, but are not limited to:

    a.  whether Plaintiff's and Class Members' PII were accessed, compromised, or stolen in the Data Breach;

    b.  whether Defendant owed a legal duty to Plaintiff and the Class Members;

    c.  whether Defendant failed to take adequate and reasonable steps to safeguard the PII of Plaintiff and Class Members;

    d.  whether Defendant failed to adequately monitor its data security systems;

    e.  whether Defendant failed to comply with applicable laws, regulations, and industry standards relating to data security;

    f.  whether Defendant knew or should have known that it did not employ adequate and reasonable measures to keep Plaintiff's and Class members' PII secure; and

    g.  whether Defendant's adherence to FTC data security obligations, industry standards, and measures recommended by data security experts would have reasonably prevented the Data Breach.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Nationwide Class)**

102.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully alleged herein.

103.    Plaintiff brings this claim on behalf of herself and the Nationwide Class.

104.    Defendant required Plaintiff and Class Members to submit sensitive personal information, including their PII, in order to obtain mortgaging services.  Defendant collected, stored, used, and benefited from the non-public PII of Plaintiff and Class Members in the provision of servicing mortgages on Plaintiff's and Class Members' properties.

105.    Plaintiff and Class Members entrusted Defendant with their PII and Defendant was fully cognizant of the value and importance of the PII and the types of harm that Plaintiff and Class

Members could and would suffer if the PII were wrongfully disclosed.

106. Defendant negligently created a dangerous situation by failing to take adequate and reasonable steps to safeguard Plaintiff's and Class Members' sensitive PII from unauthorized release or theft.

107. Defendant owed an independent duty, separate and apart from the parties' contractual relationship, to Plaintiff and Class Members to exercise reasonable care in obtaining, securing, deleting, protecting, and safeguarding the sensitive PII, and preventing the PII from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

108. Defendant was required to prevent foreseeable harm to Plaintiff and Class Members. Accordingly, Defendant had a duty to take adequate and reasonable steps to safeguard their sensitive PII from unauthorized release or theft.  Defendant's duties, included, but were not limited to: (1) designing, maintaining, and testing its data security systems, data storage architecture, and data security protocols to ensure Plaintiff's and Class Members' PII in its possession was adequately secured and protected; (2) implementing processes that would detect an unauthorized breach of its security systems and data storage architecture in a timely and adequate manner; (3) timely acting on all warnings and alerts, including public information, regarding its security vulnerabilities and potential compromise of the PII of Plaintiff and Class Members; and (4) maintaining data security measurers consistent with industry standards and applicable federal and state laws and other requirements.

109. Defendant owed a common law duty to prevent foreseeable harm to Plaintiff and Class Members.  The duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices of Defendant in its collection, storage, and use of PII from Plaintiff and Class Members.  It was foreseeable that Plaintiff and Class Members

would be harmed by the failure to protect their PII because malicious actors routinely attempt to steal such information for use in nefarious purposes.

110.    Defendant's obligation to use adequate and reasonable security measures also arose because Defendant collected, stored, and used the PII of Plaintiff and Class Members for the procurement and provision of mortgage services.

111.    Additionally, the policy of preventing future harm weighs in favor of finding a Defendant had a duty towards Plaintiff and Class Members.

112.    Defendant also owed a duty to timely disclose the material fact that its computer systems and data security practices and protocols were inadequate to safeguard users' personal and financial data from theft.

113.    The injuries suffered by Plaintiff and Class Members were proximately and directly caused by Defendant's failure to follow reasonable, industry standard security measures to protect Plaintiff's and Class Members' PII.

114.    When individuals have their personal information stolen, they are at substantial risk for imminent identity theft, and need to take additional steps to protect themselves, including, for example, buying credit monitoring services and purchasing or obtaining credit reports to protect themselves from identity theft.

115.    If Defendant had implemented the requisite, industry-standard security measures and exercised adequate and reasonable care, data thieves would not have been able to take the PII of Plaintiff and Class Members.

116.    Defendant breached these duties through the conduct alleged here in this Complaint by, including without limitation, failing to protect the PII in its possession; failing to maintain adequate computer systems and allowing unauthorized access to and exfiltration of Plaintiff's and

Class Members' PII; failing to disclose the material fact that Defendant's computer systems and data security practices were inadequate to safeguard the PII in its possession from theft; and failing to disclose in a timely and accurate manner to Plaintiff and Class Members the material fact of the Data Breach.

117.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their PII would not have been compromised.  And, as a direct and proximate result of Defendant's failure to exercise adequate and reasonable care and use commercially adequate and reasonable security measures, the PII of Plaintiff and Class Members was accessed by ill-intentioned individuals who could and will use the information to commit identity or financial fraud.  Plaintiff and Class Members face the imminent, certainly impending, and substantially heightened risk of identity theft, fraud, and further misuse of their personal data.

118.    There is a temporal and close causal connection between Defendant's failure to implement security measures to protect the PII of current and former borrowers and the harm suffered, or risk of imminent harm suffered, by Plaintiff and Class Members.

119.    It was foreseeable that Defendant's failure to exercise reasonable care to safeguard the PII in its possession or control would lead to one or more types of injury to Plaintiff and Class Members.  The Data Breach was also foreseeable given the known, high frequency of cyberattacks and data breaches in the loan servicing industry.

120.    Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures.  Defendant knew of or should have known of the inherent risks in collecting and storing PII, the critical importance of providing adequate security of PII, the current cyber scams being perpetrated on PII, and that it had inadequate protocols, including security protocols in place to secure the PII of Plaintiff and Class Members.

121.    Defendant's own conduct created the foreseeable risk of harm to Plaintiff and Class Members.  Defendant's misconduct included its failure to take the steps and opportunities to prevent the Data Breach and its failure to comply with industry standards for the safekeeping and encrypted authorized disclosure of the PII of Plaintiff and Class Members.

122.    Plaintiff and Class Members have no ability to protect their PII that was and is in Defendant's possession.  Defendant alone was, and is in, a position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach.

123.    As a direct and proximate result of Defendant's negligence as alleged above, Plaintiff and Class Members have suffered, will suffer, or are at increased risk of suffering:

    a.   The compromise, publication, theft and/or unauthorized use of their PII;

    b.   Unauthorized use and misuse of their PII;

    c.   The loss of the opportunity to control how their PII are used;

    d.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

    e.   Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

    f.   The imminent and certain impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

    g.   The continued risk to their PII that is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII in Defendant's

possession; and

h. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

124. Pursuant to the FTC Act, 15 U.S.C. §45, Defendant had a duty to provide fair and adequate computer systems and data security measures to safeguard the PII of Plaintiff and Class Members.

125. The FTC Act prohibits "unfair . . . practices in or affecting commerce," which the FTC has interpreted to include businesses' failure to use reasonable measures to protect PII.  The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.  In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

126. Defendant solicited, gathered, and stored PII of Plaintiff and Class Members to facilitate transactions that affect commerce.

127. Defendant's violation of the FTC Act (and similar state statutes) constitutes negligence.

128. Plaintiff and Class Members are within the class of persons that the FTC Act (and similar state statutes) were intended to protect.

129. The harm that occurred as a result of the Data Breach is the type of harm the FTC Act (and similar state statutes), seeks to prevent.  The FTC has pursued enforcement actions against businesses which, as a result of their failure to employ adequate and reasonable data security measures, caused the same harm as that suffered by Plaintiff and Class Members.

130. As a direct and proximate result of Defendant's violations of the above-mentioned

statutes (and similar state statutes), Plaintiff and Class Members have suffered, and continue to suffer, damages arising from the Data Breach as described herein and are entitled to compensatory, consequential, and punitive damages in an amount to be proven at trial.

**COUNT II**
**Violation of the Deceptive Trade Practices – Consumer Protection Act,**
**Texas Bus. & Com. Code §17.41, *et seq*.**

**(On Behalf of Plaintiff and the Texas Subclass)**

131.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully alleged herein.

132.    Plaintiff brings this claim on behalf of herself and the Texas Subclass.

133.    Defendant is a "person" as defined by §17.45(3).

134.    Plaintiff and the Texas Subclass members are "consumer[s]" as defined by §17.45(4).

135.    Defendant advertised, offered, or sold services in Texas and engaged in trade or commerce directly or indirectly affecting the people of the state of Texas, as defined by §17.45(6).

136.    Defendant engaged in false, misleading, or deceptive acts and practices, in violation of §§17.46(b)(5), (7), and (9), including:

    a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

    b.    Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

    c.    Advertising goods or services with intent not to sell them as advertised.

33

137.    Defendant's false, misleading and deceptive acts and practices include:

    a.  Failing to protect the PII in its possession;

    b.  Failing to implement and maintain adequate, industry-standard computer systems and allowing unauthorized access to and exfiltration of Plaintiff's and Class Members' PII, which was a direct and proximate cause of the Data Breach;

    c.  Failing to identify and remedy foreseeable security and privacy risks;

    d.  Failing to disclose the material fact that Defendant's computer systems and data security practices were inadequate to safeguard the PII in its possession from theft;

    e.  Failing to disclose in a timely and accurate manner to Plaintiff and Class Members the material fact of the Data Breach;

    f.  Misrepresenting that they would protect the privacy and confidentiality of Plaintiff's and Class Members' PII;

138.    Defendant intended to mislead Plaintiff and Class Members and induce them to rely on its misrepresentations and omissions.

139.    Defendant's misrepresentations and omissions were material because they were likely to deceive reasonable consumers about the adequacy and security of Defendant's data storage systems and Defendant's ability to protect consumers' PII.

140.    Plaintiff and Class Members acted reasonably in relying on Defendant's misrepresentations and omissions and could not have discovered Defendant's data systems were actually inadequate.

141.    Had Defendant disclosed to Plaintiff and Class Members that its data systems were not secure and therefore vulnerable to attack, Plaintiff and Class Members would not have relinquished their private information and Defendant would have been forced to adopt adequate

data security practices to comply with the law and continue doing business.

142.    Defendant owed a common law duty to prevent foreseeable harm to Plaintiff and Class Members.  The duty existed because Plaintiff and Class Members provided their PII in exchange for Defendant's services, and they were the foreseeable and probable victims of any inadequate security practices of Defendant in its collection, storage, and use of PII from Plaintiff and Class Members.  It was foreseeable that Plaintiff and Class Members would be harmed by the failure to protect their PII because malicious actors routinely attempt to steal such information for use in nefarious purposes.

143.    Defendant violated §17.50(a)(1) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not; representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and advertising goods or services with intent not to sell them as advertised.  Consumers relied on these misrepresentations and omissions to consumers' own detriment.

144.    Defendant alone knew about the deficiencies of its data systems.  Consumers, including Plaintiff and Class Members, lacked this knowledge because this information was known exclusively by Defendant, consumers lack expertise in information security.  Even if they did have this expertise, consumers do not have access to Defendant's data systems to ensure the security of their PII.

145.    As a direct and proximate result of Defendant's negligence as alleged above, Plaintiff and Class Members have suffered, will suffer, or are at increased risk of suffering:

a.   The compromise, publication, theft and/or unauthorized use of their PII;

b.   Unauthorized use and misuse of their PII;

c.   The loss of the opportunity to control how their PII are used;

d.   Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

e.   Lost opportunity costs and lost wages and time associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

f.   The imminent and certain impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals;

g.   The continued risk to their PII that is subject to further breaches so long as Defendant fails to undertake appropriate measures to protect the PII in Defendant's possession; and

h.   Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

146.    Plaintiff and Class Members seek all monetary and non-monetary relief as the court deems just and proper.


**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Class, respectfully requests the following relief:

a.    An order certifying this case as a class action on behalf of the Class, defined

36

above, appointing Plaintiff as Class representative and appointing the undersigned counsel as Class counsel;

b.      A mandatory injunction directing Defendant to adequately safeguard Plaintiff's and the Class's PII by implementing improved security procedures and measures as outlined above;

c.      An award of other declaratory, injunctive, and equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

d.      An award of restitution and compensatory, consequential, and general damages to Plaintiff and Class Members, including nominal damages as allowed by law in an amount to be determined at trial or by this Court;

e.      An award of actual or statutory damages to Plaintiff and Class Members in an amount to be determined at trial or by this Court;

f.      An award of reasonable litigation expenses and costs and attorneys' fees to the extent allowed by law;

g.      An award to Plaintiff and Class Members of pre- and post-judgment interest, to the extent allowable; and

h.      Award of such other and further relief as equity and justice may require.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

DATED:  April 11, 2022                    **ROBBINS GELLER RUDMAN**
                                          **& DOWD LLP**


                                          **Stuart A. Davidson**
                                          _____
                                          STUART A. DAVIDSON

4854-2453-8907

STUART A. DAVIDSON (FBN 0084824)
DOROTHY P. ANTULLIS (FBN 890421)
ERIC S. DWOSKIN (FBN 112459)
MAXWELL H. SAWYER (FBN 1003922)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
sdavidson@rgrdlaw.com
dantullis@rgrdlaw.com
edwoskin@rgrdlaw.com
msawyer@rgrdlaw.com

Anne T. Regan (*pro hac vice* forthcoming)
Nathan D. Prosser ( *pro hac vice* forthcoming)
Lindsey L. Larson (*pro hac vice* forthcoming)
**HELLMUTH & JOHNSON PLLC**
8050 West 78th Street
Edina, MN  55439
Phone: (952) 941-4005
Fax: (952) 941-2337
aregan@hjlawfirm.com
nprosser@hjlawfirm.com
llabellelarson@hjlawfirm.com

*Counsel for Plaintiff and the Putative Class*

4854-2453-8907